NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough-northern judicial district
No. 2021-0551

DAN HYNES

v.

NEW HAMPSHIRE DEMOCRATIC PARTY & a.

Submitted: September 8, 2022
Opinion Issued: June 1, 2023

Dan Hynes, self-represented party, on the brief.

Shaheen & Gordon, P.A., of Concord (William E. Christie on the brief), for the defendants.

HANTZ MARCONI, J. The plaintiff, Dan Hynes, appeals two orders of the Superior Court granting in part the motion to dismiss filed by the defendants,[1] the New Hampshire Democratic Party (NHDP) and Raymond Buckley, and granting the defendants' motion for summary judgment. We affirm in part, reverse in part, vacate in part, and remand.

---

[1] Bridge Communications was initially a party to this action but was removed as a defendant during the course of the litigation. As a result, Bridge Communications is not a party to this appeal.

I

The record supports the following facts. At all times relevant to this appeal, the plaintiff was an attorney in the State of New Hampshire. In 2009, the plaintiff was convicted of theft by extortion, which was later annulled pursuant to RSA 651:5, X. As a result of the conviction, the plaintiff was temporarily suspended from the practice of law, but he was not disbarred.

In 2018, the plaintiff was "the Republican nominee for New Hampshire State Senate District 9." During the course of the plaintiff's campaign, the defendants "contracted with Bridge Communications to prepare mail pieces for certain state senate candidates," including the plaintiff's opponent for the state senate seat. Bridge Communications, with the aid of an NHDP staffer, prepared a political message that was distributed by mail (the mailer or flyer). The mailer contained the message:

THE WRONG KIND OF CONVICTIONS.
[The plaintiff] targeted woman-owned businesses for extortion. [He] was charged by Republican Attorney General Kelly Ayotte, convicted by the state of New Hampshire for "theft by extortion" and disbarred.

The back of the mailer cited two hyperlinks, which directed the reader to: (1) a letter to the editor concerning the plaintiff's conviction, annulment, and suspension; and (2) a New Hampshire Supreme Court decision related to the plaintiff's convictions. The mailer was distributed "to prospective voters in State Senate District 9."

The plaintiff subsequently filed a lawsuit against the defendants in superior court based on the content of the mailer, claiming that the statements contained therein constituted: (1) defamation per se; (2) defamation per quod; (3) libel; (4) invasion of privacy — false light; and (5) violation of RSA 651:5 (2016). The defendants moved to dismiss, asserting, inter alia, that the statements were "true or substantially true" and were not made "with knowledge of [their] falsity or with reckless disregard of the truth." The defendants further argued that RSA 651:5 does not create a private right of action and that the plaintiff failed to state a claim for invasion of privacy — false light.

The Trial Court (Brown, J.) granted the motion to dismiss in part, dismissing the defamation and libel claims as they related to the statement that the plaintiff had been convicted of theft by extortion. Specifically, the trial court determined that the "statement that plaintiff had been convicted of a crime was not defamatory" because it was true. The trial court also dismissed counts four and five, determining that the plaintiff failed to state a claim for false light — invasion of privacy and that RSA 651:5 does not create a civil

2

cause of action.  It did not, however, dismiss the defamation and libel claims as they related to the statement that the plaintiff was disbarred, finding that whether the statement was substantially true was a question for the jury.

After a period of discovery, the defendants moved for summary judgment on the plaintiff's disbarment-based libel and defamation claims.  The Trial Court (Anderson, J.) granted the defendants' motion for summary judgment, finding that "the statement that plaintiff was disbarred was substantially true in context" and that the plaintiff, as a public figure, "failed to meet his burden to show actual malice in the publication of the flyer."  The plaintiff filed a motion for reconsideration, which the court denied.  Thereafter, the plaintiff appealed both the trial court's order on the motion to dismiss and its order on summary judgment.

II

We note that this case arises from political activity.  "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Buckley v. Valeo, 424 U.S. 1, 14 (1976).  Thus, "[t]he First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  Id. (quotation and alterations omitted).  There is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).  "[E]rroneous statement[s] [are] inevitable in free debate," and, as such, they "must be protected if the freedoms of expression are to have the breathing space that they need to survive."  Id. at 271-72 (quotation and alterations omitted).

However, the Federal Constitution does not prohibit actions in defamation brought by a public official or political candidate.  See id. at 279-81.  Rather, the Supreme Court of the United States has recognized "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  Id. at 279-80.  We employ this same standard in New Hampshire.  See, e.g., MacDonald v. Jacobs, 171 N.H. 668, 674-75 (2019).  While we understand that the dissent imports these First Amendment principles into its evaluation of whether a statement is true or false, we believe the First Amendment protections for political speech are properly captured in the heightened actual malice standard.  It is with this background in mind that we turn to the issues presented by this appeal.

3

## III

We first turn to the plaintiff's appeal of the trial court's order granting in part the defendants' motion to dismiss. In reviewing an order granting a motion to dismiss, we assume the truth of the facts as alleged in the plaintiff's pleadings and construe all reasonable inferences in the light most favorable to the plaintiff. Beane v. Dana S. Beane & Co., 160 N.H. 708, 711 (2010). The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery. Id. This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law. Id. We may also consider documents attached to the plaintiff's pleadings; or documents the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint. Id. We will uphold the granting of the motion to dismiss if the facts pled do not constitute a basis for legal relief. Id.

The plaintiff first argues that the trial court erred in dismissing counts I, II, III, and V related to the "defendants knowingly disclosing an annulled conviction." He argues that "RSA 651:5 specifically lays out when there can be a civil cause of action," and "in order to not be held civilly liable, one must . . . comply with the requirements of RSA 651:5[, XVI]." We construe the plaintiff's argument, in part, as challenging the trial court's determination that no civil cause of action exists under RSA 651:5.

Determining whether RSA 651:5 creates a civil cause of action requires us to engage in statutory interpretation. We review the trial court's statutory interpretation de novo. In re D.O., 173 N.H. 48, 52 (2020). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. Id.

RSA 651:5 states, in pertinent part:

**Annulment of Criminal Records.**
. . . .
X. Upon entry of an order of annulment:
    (a) The person whose record is annulled shall be treated in all respects as if he or she had never been arrested, convicted or sentenced.
    . . . .

4

XVI. A journalist or reporter shall not be subject to civil or criminal penalties for publishing or broadcasting:
>    (a) That a person had a criminal record that has been annulled, including the content of that record.
>    (b) That a person has a criminal record, including the content of such record, without reporting that the record has been annulled, if the journalist or reporter does not have knowledge of the annulment.

RSA 651:5, X(a), XVI(a)-(b). The plaintiff's arguments rely, in part, on the premise that these provisions of RSA 651:5 create a cause of action to hold the defendants civilly liable because they are not journalists, reporters, or members of the media. We disagree.

We have previously held that RSA 651:5 "does not provide a civil remedy to the person whose record is disclosed." Lovejoy v. Linehan, 161 N.H. 483, 487 (2011). The plaintiff seems to rely specifically on the language in RSA 651:5, XVI, which was added to the statute by amendment in 2011 after Lovejoy was decided, to support his position that RSA 651:5 creates a private right of action. See Laws 2011, ch. 219; see also RSA 651:5, XVI(a)-(b). However, there is no language, either in paragraph XVI, or in any other amendment to the statute, that serves to create a civil cause of action. See RSA 651:5. Rather, paragraph XVI prevents any common law or statutory cause of action from being brought against a journalist or reporter who publishes the fact of an individual's conviction under certain circumstances. See RSA 651:5, XVI(a)-(b). Thus, we agree with the trial court that "RSA 651:5 does not provide plaintiff a separate cause of action."

This conclusion, however, does not end our inquiry. The plain language of RSA 651:5, XVI evinces the legislature's acknowledgement that a cause of action may exist where the publisher is aware that a criminal record has been annulled but fails to include that fact in the publication. See RSA 651:5, XVI. As a result, we note that, although the statute does not create a private right of action, it does not prevent the plaintiff from filing a defamation claim under the common law.

To that end, the plaintiff argues that the trial court erred when it concluded that the statement that the plaintiff was "convicted by the State of New Hampshire for 'theft by extortion'" is true and, therefore, an absolute defense to a defamation claim. A plaintiff establishes defamation by showing that the defendants failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party, unless a valid privilege applies to the communication. Thomas v. Telegraph Publ'g Co., 155 N.H. 314, 327 (2007). However, one who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true. Id. at 335.

5

In the law of defamation, truth is defined as substantial truth, as it is not necessary that every detail be accurate. Id. In other words, the literal truth of a statement is not required so long as the imputation is substantially true so as to justify the gist or sting of the remark. Id. Where, as here, the plaintiff is a public figure, he must also prove that the statement was made with "actual malice," meaning "'with knowledge that [the statement] was false or with reckless disregard of whether it was false or not.'" MacDonald v. Jacobs, 171 N.H. at 674-75 (quoting New York Times Co., 376 U.S. at 280 (brackets omitted)).

The plaintiff argues that because his criminal conviction was annulled, it is treated "in all respects as if he . . . had never been arrested, convicted or sentenced," and therefore he "does not have a conviction as a matter of law." We agree. Although the legislature did not create a private right of action, the plain language of RSA 651:5 nonetheless makes clear the legal effect and consequences of an annulment. As noted above, the statute states that a "person whose record is annulled shall be treated in all respects as if he or she had never been arrested, convicted or sentenced . . . ." RSA 651:5, X(a) (emphases added). We begin with the word "annulment." Its plain meaning is: "[t]he act of nullifying or making void." Black's Law Dictionary 114 (11th ed. 2019). Because a criminal arrest, conviction or sentence potentially implicates one's personal freedom, these are the most extreme steps the State can take against individuals. The effect of New Hampshire's annulment statute is to, as a matter of law, render the arrest, conviction, or sentence void for the purposes of public discourse. Cf. State v. Williams, 173 N.H. 540, 548 (2020) ("[T]he purpose of [the annulment statute] is to reduce the collateral consequences of a criminal conviction and to afford an offender a chance to start anew without this stigma in his record." (quotation omitted)). We note that other jurisdictions with similar laws rely upon different statutory framework. See, e.g., G.D. v. Kenny, 15 A.3d 300, 311-15 (N.J. 2011) (concluding that N.J.S.A. ch. 52, titled "Expungement of Records Statute," applies to government agencies record keeping, but does not prevent disclosure of the conviction as a matter of public discourse); see also Martin v. Hearst Corp., 777 F.3d 546, 550-52 (2d Cir. 2015) (explaining that Connecticut courts have concluded that the Connecticut "Erasure of criminal records" statute, Conn. Gen. Stat. Ann. § 54-142a (West 2012), provides that the person subject to the erasure of their record "shall be deemed to have never been arrested within the meaning of the general statutes," but it does not "purport to wipe from the public record the fact that certain historical events have taken place" (quotations omitted) (emphasis added)). RSA 651:5 is different from these statutes in other jurisdictions in that it expressly provides that the annulment has the effect of allowing that the "person whose record is annulled shall be treated in all respects as if he or she had never been arrested, convicted or sentenced," which we conclude includes within the public discourse. See RSA 651:5, X(a), XVI(a)-(b) (emphasis added). Given New Hampshire's unique statutory scheme

6

conferring an annulment, the dissent's reliance on decisions from other jurisdictions does not advance our primary duty: to interpret and apply our law.

In light of the statute's effect of annulling an arrest, conviction or sentence, the legislature has carefully prescribed how the records of an arrest, conviction or sentence should be treated and how they should be characterized to the public. See RSA 651:5. For example, a person whose record has been annulled shall receive "a certificate stating that such person's behavior after the conviction has warranted the issuance of the order, and that its effect is to annul the arrest, conviction and sentence" and the criminal records unit, as well as the arresting and prosecuting agencies, shall be notified. RSA 651:5, X(b). Those agencies "shall clearly identify in their respective files and in their respective electronic records that the arrest or conviction and sentence have been annulled." RSA 651:5, X(e) (emphasis added).

In addition, a "journalist or reporter shall not be subject to civil or criminal penalties for publishing" that "a person had a criminal record that has been annulled," or that "a person has a criminal record, including the content of such record, without reporting that the record has been annulled, if the journalist or reporter does not have knowledge of the annulment." RSA 651:5, XVI(a)-(b) (emphasis added). The statute further requires that, "[i]n any application for employment, license or other civil right or privilege, or in any appearance as a witness in any proceeding or hearing, a person may be questioned about a previous criminal record only in terms such as 'Have you ever been arrested for or convicted of a crime that has not been annulled by a court?'" RSA 651:5, X(f) (emphasis added).

The rationale is plain. Annulment provides the potential for a clean slate when a person's "behavior after the conviction has warranted" it. RSA 651:5, X(b); see also Williams, 173 N.H. at 548. Commentators have described the adverse socioeconomic consequences of criminal convictions and the potential benefits of expungement-like procedures. See, e.g., J.J. Prescott & Sonja B. Starr, Expungement of Criminal Convictions: An Empirical Study, 133 Harv. L. Rev. 2460 (2020). Numerous states, including New Hampshire, have expanded the reach of their laws in recent years. See, e.g., id.; RSA 651:5-b. The unambiguous language of RSA 651:5 advances the possibility of achieving a clean slate by minimizing the reputational harm flowing from a criminal conviction. See Thomas, 155 N.H. at 323. Thus, just as the legislature has defined the underlying offense in the Criminal Code, it has also defined, in the Criminal Code, how an annulled conviction must be characterized. See RSA 651:5. New Hampshire law is clear: after an annulment has been granted, what was once a conviction becomes a conviction that "has . . . been annulled." RSA 651:5, X(f).

7

Here, the flyer's statement that the plaintiff was "convicted by the state of New Hampshire for 'theft by extortion'" is contrary to RSA 651:5 and, therefore, false. The fact that the plaintiff was convicted undeniably exists, but as a matter of New Hampshire law, upon annulment, it is false and misleading to fail to state that the conviction was annulled. Our conclusion is grounded in the statutory analysis set forth above. In particular, we note that to conclude otherwise would be to render the legislature's grant of civil and criminal immunity to journalists and reporters surplusage. See RSA 651:5, XVI(a)-(b). It would also undermine the legislature's express objective to create a clean slate "in all respects" for those whose convictions have been annulled. RSA 651:5, X(a). In the context of this case, to conclude otherwise could discourage those with annulled criminal records from seeking elective office, a constitutionally protected right. N.H. CONST. pt. I, art. 11 ("Every inhabitant of the state, having the proper qualifications, has equal right to be elected into office."); cf. RSA 651:5, X(f) (providing that in any application for a "civil right or privilege," "a person may be questioned about a previous criminal record only in terms such as 'Have you ever been arrested for or convicted of a crime that has not been annulled by a court?'").

Moreover, as a general matter, where the State has, as a matter of law, altered a previously taken action, it would be false and misleading to characterize the previously taken action in its unaltered form. If, for example, a state licensing board revokes a professional's license, it is unlawful for that professional to advertise that she or he is still licensed. See RSA 310-A:1-m, VIII (Supp. 2022). Similarly, where a statute or regulation requires disclosure of additional facts, the partial disclosure may carry defamatory meaning. See, e.g., Martin, 777 F.3d at 552 ("But in certain circumstances even a technically true statement can be so constructed as to carry a false and defamatory meaning by implication or innuendo. Where a publication implies something false and defamatory by omitting . . . key facts, the publication may be actionable even though all of the individual statements are literally true when considered in isolation."); see also Turner v. Connecticut Lottery Corporation, No. 3:20-cv-1045, 2021 WL 4133757 at *15 (D. Conn. Sept. 10, 2021) (finding that the publication of a letter placing the plaintiff on administrative leave that omitted the reason she was placed on leave — information that is required to be included in a termination under the relevant local regulation — could give rise to an actionable defamatory implication). Therefore, while we appreciate the dissent's reliance on the presence of historical facts evidencing the conviction, those historical facts have been qualified by the annulment. Although the dissent accurately posits that the "safe harbor" provision of RSA 651:5, XVI does not create liability for the unqualified disclosure of a conviction, it overlooks that the provision acknowledges that such liability may independently exist. Moreover, we are unpersuaded that the statute does not apply to private persons acting as journalists and publishers.

8

For the foregoing reasons, we conclude that the trial court erred in finding that the statement on the flyer was true. As a matter of New Hampshire law, a true and accurate characterization of the conviction had to include the fact of the conviction's annulment. Thus, failure to include the fact of the conviction's annulment renders the statement false as a matter of law. See RSA 651:5. Accordingly, we reverse the trial court's dismissal of the plaintiff's defamation claim.

The plaintiff next argues that the trial court erred in dismissing his claim for invasion of privacy — false light. The trial court dismissed the claim, concluding that it failed to state a claim for false light as articulated in the Restatement (Second) of Torts § 652E. The trial court premised its decision on the conclusion that "the 'gist' of the statement is that plaintiff had been a [sic] convicted of a crime, which was substantially true." As we have just explained, as a matter of New Hampshire law, articulating the fact of plaintiff's conviction without including the fact of the conviction's annulment is a falsehood. Thus, the trial court's decision on whether the plaintiff had failed to state a claim for false light was premised on an erroneous conclusion. For this reason, we vacate the trial court's decision and remand for review consistent with this opinion.

We note, however, that we have yet to recognize the false light variation of the invasion of privacy tort under New Hampshire law. See, e.g., Hamberger v. Eastman, 106 N.H. 107 (1964). In any case in which we are asked to recognize a new cause of action, it is a question of policy whether it would be wise to provide the relief that the plaintiff seeks. Rockhouse Mt. Property Owners Assoc., Inc. v. Town of Conway, 127 N.H. 593, 597 (1986). Reaching an answer to this question requires two quite separate steps, for we must determine whether the interest that the plaintiff asserts should receive any legal recognition and, if so, whether the relief that the plaintiff requests would be an appropriate way to recognize it. Id. at 597-98.

Here, neither party has briefed whether we should adopt the tort of invasion of privacy — false light. For this reason, we conclude that the issue of whether we would recognize a claim of false light is insufficiently developed for our review at this time. See White v. Auger, 171 N.H. 660, 665 (2019) ("[W]e will not address arguments that a party has not sufficiently developed in its brief."). However, on remand, the parties are free to present arguments to the trial court and further develop the record on this issue.

IV

We next turn to the plaintiff's appeal of the trial court's 2021 order granting the defendants' motion for summary judgment. The plaintiff asserts

9

that the trial court erred in finding: (1) the statement that he was disbarred was "substantially true"; and (2) the plaintiff failed to present evidence of actual malice. We will consider each of the plaintiff's arguments in turn.

When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. Loeffler v. Bernier, 173 N.H. 180, 183 (2020). If there is no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. Id. We review the trial court's application of the law to the facts de novo. Id.

The plaintiff first argues "[w]hether the word 'disbarred' is substantially true is a question of fact that should be left up to a jury." (Bolding omitted.) The defendants respond that the trial court was correct in concluding that the statement was substantially true because "[t]he purpose of the flyer in its entirety [was] to notify potential voters of Plaintiff's previous criminal activity and that, as a result of such criminal activity, his law license was adversely affected." (Italics omitted.) We agree with the plaintiff.

The trial court found that the term "disbarred" was substantially true, because "it is not apparent that Plaintiff's reputation would have fared better if Defendants had used the word 'suspended' as opposed to 'disbarred,' as the reader's takeaway remains the same." We disagree. The difference between the terms "suspended" and "disbarred" is significant. "Suspension" from the practice of law, as it is commonly understood, means "a fairly stringent level of lawyer discipline that prohibits the lawyer from practicing law for a specified period." Black's Law Dictionary 1748 (11th ed. 2019). In the New Hampshire attorney discipline system, "[s]uspension" is defined as "the suspension of an attorney's right to practice law in this State, for a period of time specified by the court or by the professional conduct committee." Sup. Ct. R. 37(2)(j). "Disbarment," on the other hand, generally means "[t]he expulsion of a lawyer from the bar or from the practice of law, usu[ally] because of some disciplinary violation . . . typically a permanent removal from the practice of law." Black's Law Dictionary 581 (11th ed. 2019). Further, in the New Hampshire attorney discipline system, "[d]isbarment" is defined as "the termination of a New Hampshire licensed attorney's right to practice law in this State and automatic expulsion from membership in the bar of this State." Sup. Ct. R. 37(2)(d).

Therefore, as the trial court noted in its order on the motion to dismiss in this case, "[t]he statement that plaintiff was disbarred rather than suspended harms his reputation by implying that he had been lying about the current state of his bar licensure and employment in the course of his campaign and that he had been practicing law illegally." This potentially adverse effect on the

10

plaintiff's reputation presented a genuine issue of material fact precluding summary judgment because we cannot say, as a matter of law, that the "gist or sting" of the word "disbarred" as opposed to "suspended" is substantially the same in the mind of the average reader. Loeffler, 173 N.H. at 183. Thus, although we note that the dissent would make the same factual determination as the trial court, in our view, the issue of whether the "disbarred" language is substantially true is a question best left to the province of the jury.

Finally, the plaintiff argues that the trial court erred in granting summary judgment because "there was a dispute of material fact as to whether defendants acted with actual malice." (Capitalization and bolding omitted.) Conversely, as an alternate ground for summary judgment, the defendants assert that the plaintiff "failed to present clear and convincing evidence of actual malice." (Emphasis and capitalization omitted.) We agree with the plaintiff that there remains a dispute of material fact as to actual malice, thus rendering the issue unsuitable for summary judgment. See id.

The trial court based its decision on the fact that the plaintiff "has put forth no evidence that Defendants seriously doubted the truth of the publication," highlighting that the plaintiff had not put forth evidence "of Defendants' subjective intent or knowledge on this issue." We disagree. The plaintiff attached to his complaint the Nashua Telegraph article cited in the defendants' mailer, which plainly states: "[The plaintiff] is a lawyer (although he was suspended from practicing law for a period)." Nowhere in this article, nor in the supreme court decision also cited by the mailer, see State v. Hynes, 159 N.H. 187 (2009), does the word "disbarred" appear. The inclusion of this citation in the mailer could lead a reasonable jury to find that the defendants were subjectively aware that the plaintiff had not been disbarred and, therefore, subjectively aware that the language in the mailer was untrue. It is for the jury to decide whether the statement was made "with knowledge that the statement was false or with reckless disregard of whether it was false or not." MacDonald, 171 N.H. at 674-75 (quotation and brackets omitted). For these reasons, we conclude that the trial court erred in granting summary judgment on the remaining libel and defamation claims in favor of the defendants. Accordingly, we reverse the 2021 order granting summary judgment.

Affirmed in part; reversed in part; vacated in part; and remanded.

MACDONALD, C.J., and DONOVAN, J., concurred; HICKS, J., concurred in part and dissented in part.

HICKS, J., concurring in part and dissenting in part. This case involves statements made in the heat of a political campaign for state senate. "The right to speak freely on matters of public concern and the right to criticize a candidate for public office implicate core values protected by" the Federal Constitution. G.D. v. Kenny, 15 A.3d 300, 316 (N.J. 2011). "[D]ebate on the qualifications of candidates is integral to the operation of the system of government established by our [Federal] Constitution." Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214, 223 (1989) (quotation and brackets omitted). "A political challenger must be afforded leeway to characterize the conduct of his opponent, even if such characterization takes the most negative perspective, in order to ensure 'uninhibited, robust, and wide-open' debate on public issues." Issa v. Applegate, 242 Cal. Rptr. 3d 809, 825-26 (Ct. App. 2019) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). "When a candidate enters the political arena, he or she must expect that the debate will sometimes be rough and personal, and cannot 'cry Foul!' when an opponent . . . attempts to demonstrate that he or she lacks the 'sterling integrity' trumpeted in campaign literature and speeches." Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 687 (1989) (quotations and citation omitted). "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." Eu, 489 U.S. at 223 (quotation omitted). "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Sullivan, 376 U.S. at 270.

In Sullivan, the United States Supreme Court concluded that the constitutional guarantee of freedom of speech limits the ability of states to provide common law remedies for defamation: the Court explained that what a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law — the fear of damage awards may be more inhibiting than the fear of prosecution under a criminal statute. See id. at 277. Thus, the First Amendment "has its fullest and most urgent application" to the defendants' speech in this case. Eu, 489 U.S. at 223 (quotation omitted). Application of these fundamental constitutional principles should lead us to affirm the judgment of the trial court.

In 2018, during the course of the plaintiff's campaign for the state senate, the defendants caused a campaign mailer to be distributed that contained the following:

THE WRONG KIND OF CONVICTIONS.
Dan Hynes targeted woman-owned businesses for extortion. Hynes was charged by Republican Attorney General Kelly Ayotte, convicted by the state of New Hampshire for "theft by extortion" and disbarred.

12

The plaintiff sued, claiming, <u>inter alia</u>, that the statements that he was convicted of theft by extortion, and that he was disbarred, were defamatory.[2] In addition, the plaintiff brought a claim for invasion of privacy — false light. On a motion to dismiss, the trial court ruled that the first statement — that the plaintiff was convicted for theft by extortion — is true and therefore not defamatory. In addition, it dismissed the claim for invasion of privacy — false light. On a motion for summary judgment, the court ruled, <u>inter alia</u>, that the second statement — that the plaintiff was disbarred — is substantially true and therefore not defamatory. I agree with the trial court.

## I. The Defamation Claims

In order to be actionable, the language complained of must be defamatory in the sense that it must tend to lower the plaintiff in the esteem of any substantial and respectable group. <u>Thomson v. Cash</u>, 119 N.H. 371, 373 (1979). The defamatory meaning must be one that could be ascribed to the words by hearers of common and reasonable understanding. <u>Id</u>. A public official can have a civil remedy for defamation <u>only</u> if the public official establishes that the utterance is false — if a defendant's statements are true, "they are protected by the First Amendment." <u>Id</u>. at 377; <u>see</u> <u>Garrison v. State of Louisiana</u>, 379 U.S. 64, 74 (1964) (public official allowed civil defamation remedy only if public official establishes that the utterance was false). "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." <u>Garrison</u>, 379 U.S. at 74; <u>see</u> <u>Grimmett v. Freeman</u>, 59 F.4th 689, 692 (4th Cir. 2023); <u>Thomas v. Telegraph Publishing Co.</u>, 155 N.H. 314, 335 (2007) (stating that "[o]ne who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true" (quotation omitted)). The plaintiff admits that he is to be considered a "public official" with respect to his defamation claims in this case. He does not dispute that he was convicted for theft by extortion. <u>See</u> <u>State v. Hynes</u>, 159 N.H. 187 (2009) (affirming plaintiff's conviction after jury trial of one count of theft by extortion). Nor has he challenged as defamatory the statement that "Dan Hynes targeted woman-owned businesses for extortion."

### A. The First Statement — Plaintiff Was Convicted For Theft By Extortion

With respect to the first statement at issue — that the plaintiff was convicted for theft by extortion — the trial court ruled that the statement was true, and therefore dismissed the plaintiff's claim that it was defamatory. On

---

[2] The plaintiff also unsuccessfully raised a claim alleging violation of RSA 651:5 (2016) (amended 2016, 2017, 2018, 2020). The majority affirms the trial court's decision that no civil cause of action exists under RSA 651:5. I agree that that decision should be affirmed, and therefore concur in the result reached by the majority to the extent that it affirms the trial court's decision on that claim.

appeal, the plaintiff does not dispute either that he committed theft by extortion or that he was convicted for theft by extortion. Rather, he argues that his conviction was annulled in 2014, and, therefore, pursuant to the annulment statute, RSA 651:5, he "does not have a conviction as a matter of law. . . . To put it another way, the statement: 'Mr. Hynes was convicted of theft by extortion' is legally and factually false, and can give rise to a defamation claim." The majority agrees. I cannot.

In Lovejoy v. Linehan, 161 N.H. 483, 486 (2011), we agreed "that an annulment under RSA 651:5 does not expressly turn the public event of a criminal conviction into a private, secret, or secluded fact." Lovejoy, 161 N.H. at 486 (quotation and brackets omitted). Nor does an annulment "'transmute a once-true fact into a falsehood.'" Grafton County Attorney's Office v. Canner, 169 N.H. 319, 326 (2016) (quoting G.D., 15 A.3d at 315-16). Rather, "annulment creates a legal fiction that a person has never been . . . convicted." Wolfgram v. N.H. Dep't of Safety, 169 N.H. 32, 38 (2016) (emphasis added); see The Free Dictionary (https://legal-dictionary.thefreedictionary.com/legal+fiction) (stating that a legal fiction is an "assumption that something occurred or someone or something exists which, in fact, is not the case").

Significantly, the annulment statute has no effect upon the underlying facts that gave rise to the conviction. See Panas v. Harakis & K-Mart Corp., 129 N.H. 591, 611-12 (1987). The plain language of the statute states that a "record of arrest, conviction and sentence of any person" may be annulled. RSA 651:5, I. Upon entry of an order of annulment, the person whose record is annulled shall be treated "as if he or she had never been arrested, convicted or sentenced." RSA 651:5, X(a). Nothing in the statute provides, however, that the person whose record is annulled shall be treated as if the person did not commit the criminal acts for which he or she was convicted — it is the record of the arrest, conviction and sentence that is annulled, not the underlying criminal conduct itself. Panas, 129 N.H. at 611 (annulment statute only extends as far as evidence of the conviction itself; it has no such effect upon the facts giving rise to the conviction). Annulment creates the legal fiction that a person has never been convicted; it does not purport to create the fiction that the person never committed the underlying criminal acts.

Thus, our case law should control here — we have already explained that RSA 651:5 does not "create an Orwellian scheme whereby previously public information—long maintained in official records—now becomes beyond the reach of public discourse." Canner, 169 N.H. at 326 (quotation omitted). RSA 651:5 does not alter the metaphysical truth of the plaintiff's past, nor does it impose a regime of silence on those who know the truth. Id. In this case, the public information in question includes the fact that the plaintiff was convicted

14

for theft by extortion. RSA 651:5 does not transmute the truth of that statement into a falsehood. Id. Prior annulled convictions "remain a historical reality." Wolfgram, 169 N.H. at 38.[3]

Moreover, nothing in RSA 651:5 supports the conclusion that upon annulment, the historically true statement that the plaintiff was convicted becomes a false statement. First, nothing in the annulment statute purports to classify any statement as "false." The statute instead directs how certain government agencies will handle records related to an annulled conviction. Court records relating to the annulled conviction are generally sealed, RSA 651:5, X(c), while the arresting agency and prosecuting agency are required to identify in their files and electronic records that the conviction has been annulled, RSA 651:5, X(e). Upon payment of a fee, the state police criminal records unit shall remove the annulled criminal record. RSA 651:5, X(d). Supreme court records relating to opinions published in the New Hampshire Reports, on the other hand, which include the records relating to the supreme court opinion that affirmed the plaintiff's conviction for theft by extortion, cannot be annulled. RSA 651:5, XV.

Nothing in RSA 651:5 mandates that a disclosure of the conviction by a member of the public include the fact of the conviction's annulment. To the contrary, the statute contains a specific requirement that only the arresting agency and the prosecuting agency identify in their files and records that a conviction has been annulled. RSA 651:5, X(e). The defendants are not, however, either an arresting or prosecuting agency. No other provision of RSA 651:5 requires that disclosures of a conviction identify the conviction as having been annulled, and nowhere does the statute impose any obligation upon a member of the public who is aware of an annulled conviction to not disclose it without also stating that it has been annulled. See generally Rogers v. Rogers, 171 N.H. 738, 745 (2019) (we interpret legislative intent from the statute as written and will not add words that the legislature did not include).

---

[3] Other authorities agree that an order annulling or expunging an arrest or conviction does not make the statement that the plaintiff was arrested or convicted untrue. See G.D., 15 A.3d at 315 (stating that "the expungement statute does not transmute a once-true fact into a falsehood"); Farach v. Rivero, 305 So. 3d 54, 57 (Fla. App. Ct. 2019) (same); Rzeznik v. Chief of Police of Southampton, 373 N.E.2d 1128, 1133 (Mass. 1978) (stating that nothing in statute or legislative history suggests "that, once the fact of a conviction is sealed, it becomes nonexistent, and hence untrue for the purposes of the common law of defamation"); Martin v. Hearst Corp., 777 F.3d 546, 551 (2d Cir. 2015) (expungement statute "creates legal fictions, but it does not and cannot undo historical facts or convert once-true facts into falsehoods"); cf. Hardiman v. Aslam, 125 N.E.3d 1185, 1193-94 (Ill. App. Ct. 2019) (statement that plaintiff had conviction for misdemeanor domestic violence was substantially true even though his conviction was in fact for simple battery against his wife, and even accepting as true plaintiff's assertion that his conviction had been expunged).

The language of the statute reveals the legislature's understanding that it was creating a legal fiction. For example, RSA 651:5, X(a) provides that upon entry of an order of annulment, "[t]he person whose record is annulled shall be treated in all respects as if he or she had never been . . . convicted," with various exceptions. (Emphasis added.) The use of "as if" acknowledges that the person was, in fact, convicted. Thus, after a conviction is annulled, it remains a fact that the person was convicted; the statute provides simply that the person is to be treated "as if" he or she had not been convicted — hence, our case law explaining that the annulment statute creates a legal fiction that the person has not been convicted. Wolfgram, 169 N.H. at 38. This is fully consistent with the purpose of an annulment, which is to limit the legal effect of the prior conviction, not to conceal the fact that it occurred. See Canner, 169 N.H. at 326 (explaining that allowing public access to records of arrests and prosecutions that have been annulled will not subvert the legal fiction created by the annulment statute that the person be treated in all respects as if he had never been arrested, convicted or sentenced, because, if the person is asked if he had been arrested, he could answer in the negative).

Thus, in my view, nothing in RSA 651:5 suggests either that the true statement that the plaintiff was convicted of theft by extortion is, by operation of the statute, now a false statement (and thus subject to civil liability for defamation), or that a statutory mandate exists requiring any communication about a conviction to disclose as part of the communication that the conviction has been annulled.[4]

If RSA 651:5 is construed as making the defendants' statement that the plaintiff was convicted of theft by extortion false and defamatory, then I believe

---

[4] A safe harbor provision for journalists and reporters in RSA 651:5, XVI was adopted in 2011 when the statute provided in part that a person was guilty of a misdemeanor if, during the life of another who has had a record of arrest or conviction annulled pursuant to this section, he discloses or communicates the existence of such record. In 2011, RSA 651:5 was amended to limit the scope of the misdemeanor crime by, inter alia, adding the safe harbor provision for journalists and reporters. See Laws 2011, ch. 219. Thereafter, in 2012, the criminal penalty in RSA 651:5 was repealed, leaving the statute silent on the question of civil and criminal liability for disclosing annulled convictions. Had the immunity provisions for journalists and reporters also been repealed, the result would have been uncertainty as to what could be published without fear of civil or criminal liability. Because the statute was silent on that issue, resolution of that issue would be left to the courts. The legislature could rationally have intended the immunity provisions for reporters and journalists to be a safe harbor going forward. A safe harbor allows journalists and reporters relief from any uncertainty that exists regarding civil or criminal liability, such as from a common law defamation action. Providing the press with a safe harbor from uncertainty does not, by negative implication, create civil or criminal liability for actions that do not fall within the safe harbor.

Finally, the safe harbor provision protects journalists and reporters from all civil and criminal liability, not simply from liability for defamation. Thus, the safe harbor provision would not be rendered surplusage by concluding, in accordance with our precedent, that the annulment statute does not transform truth into falsity.

that the statute as applied is unconstitutionally vague and a sharp departure from our established jurisprudence.

Our case law explicitly states that RSA 651:5 does not transmute a true fact into falsity. In interpreting RSA 651:5, we have stated, inter alia, that annulment "creates a legal fiction that a person has never been . . . convicted," Wolfgram, 169 N.H. at 38; that "prior convictions remain a historical reality," id., that the statute "does not alter the metaphysical truth of [the person whose conviction has been annulled's] past," Canner, 169 N.H. at 326 (quotation omitted); and that the statute "does not transmute a once-true fact into a falsehood," id. (quotation omitted). The relevant language in RSA 651:5 has not changed since those cases were decided in 2016. It is fundamentally unfair to hold that the defendants should have predicted that the language in RSA 651:5 that we repeatedly indicated did not alter the truth of the past would be construed as altering the truth of the past. See Appeal of Mullen, 169 N.H. 392, 397 (2016) (ultimate standard for judging whether a party has been afforded due process is the notion of fundamental fairness); see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982) (laws must give person of ordinary intelligence reasonable opportunity to know what is prohibited, especially if law interferes with right of free speech).

If the annulment statute did purport to make the defendants' statement "factually false" for purposes of a defamation action, then, in my view, application of the statute here would also violate the First Amendment.

> [E]fforts to impose liability for disclosure of the facts of a criminal record by deeming them constructively false and imposing defamation damages will not work. Constructive falsity would allow us to assume the falsity of the report of a criminal record while simultaneously understanding full well that the presumption of falsity is not fact. Would the [Supreme] Court permit such sleight of hand? A fair reading of the Supreme Court's opinions counsel that it would not.

Doris Del Tosto Brogan, Expungement, Defamation, and False Light: Is What Happened Before What Really Happened or is There a Chance for a Second Act in America?, 49 Loy. U. Chi. L. J., 1, 38 (2020).

The First Amendment protects true statements from civil defamation liability. That protection would be weak indeed if a government were able to impose defamation liability for any statement that the government chose to define by law as "false." See Rushman v. City of Milwaukee, 959 F. Supp. 1040, 1041 (E.D. Wis. 1997) ("the First Amendment forbids the government from arbitrating truth and fiction"). In my opinion, the defendants' statement

that the plaintiff was convicted for theft by extortion is protected by the First Amendment.[5]

Furthermore, that a statement is deemed "false" pursuant to a statute does not determine whether the same statement is "false" for purposes of a defamation action. In the law of defamation, truth is defined as "substantial truth," as it is not necessary that every stated detail be accurate. The literal truth of a statement is not required so long as the imputation is substantially true so as to justify the gist or sting of the remark. Thomas, 155 N.H. at 327. Thus, today's holding that the defendants' statement is "false" in light of RSA 651:5 does not resolve the question of whether the defendants' statement is nevertheless "substantially true" so as to justify the gist or sting of the remark.

In this case, the trial court ruled that the defendants' statement was "true," and thus the trial court had no reason to consider the defense of "substantial truth." See id. at 335 ("substantial truth is a defense to a . . . defamation claim"). Accordingly, it remains open, on remand, for the defendants to argue that the statement that the plaintiff was convicted for theft by extortion is "substantially true."[6]

The right to free speech "allows for an 'uninhibited, robust, and wide-open' discussion of public issues that 'may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials,'"

---

[5] Mandating that one who discloses a conviction must also state that the conviction was annulled also raises First Amendment concerns. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 795 (1988). Therefore, the statute would be considered a content-based regulation of speech. See id. The First Amendment guarantees "freedom of speech," which comprises "the decision both what to say and what not to say." Id. at 796-97. Compelled statements of fact may unconstitutionally burden protected speech. Id. at 797-98. Thus, a statute that purports to compel the defendants to say that the plaintiff's conviction was annulled may well violate the First Amendment.

[6] "A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." Tannerite Sports, LLC v. NBCUniversal News Group, 864 F.3d 236, 242 (2d Cir. 2017) (quotation and brackets omitted). If the inaccuracy does not have a materially different effect upon the reader than that which the literal truth would produce, then it is substantially true. See Mark v. Seattle Times, 635 P.2d 1081, 1093 (Wash. 1981); Riley v. Moyed, 529 A.2d 248, 253 (Del. 1987); see also Thomas, 155 N.H. at 336 ("If the defamatory statement is a specific allegation of the commission of a particular crime, the statement is deemed true for purposes of a substantial truth defense if the plaintiff did commit that crime."); Eugene Volokh, Libel by Omission of Exculpatory Legal Decisions, 97 Notre Dame L. Rev. 351, 355 (2021) ("[S]ometimes omitting the follow-up information doesn't sharply change the gist of the original information: an expungement or settlement, for instance, doesn't demonstrate innocence of the original charge. In that situation, omitting that information isn't libelous. Thus, for instance, it isn't libelous to mention an arrest without mentioning that it was expunged or that charges were dismissed for non-innocence-related reasons." (emphasis added)).

18

G.D., 15 A.3d at 316 (quoting Sullivan, 376 U.S. at 270), and permits a public official to have a civil remedy for defamation only if the public official establishes that the utterance was false, Garrison, 379 U.S. at 74. The legislature cannot alter the metaphysical truth of the plaintiff's past — for purposes of the First Amendment, the statement that the plaintiff was convicted for theft by extortion both was, and is, true.

### B. The Second Statement — Plaintiff Was Disbarred

I now turn to the defendants' statement that the plaintiff was disbarred, when, in fact, he was suspended from the practice of law. Here, I agree with the majority that consideration of the defense of substantial truth is appropriate.

> One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true. In the law of defamation, truth is defined as substantial truth, as it is not necessary that every detail be accurate. In other words, literal truth of a statement is not required so long as the imputation is substantially true so as to justify the gist or sting of the remark.

Thomas, 155 N.H. at 335 (quotation omitted). The notion of substantial truth "necessarily implies a thread of untruth." Id. Here, the "thread of untruth" is the erroneous statement that the plaintiff was disbarred. Thus, we must determine whether that thread of untruth has a sufficient defamatory effect to justify a civil remedy. See Eric M. Raudenbush, Variations on a Theme: Application of Masson v. New Yorker Magazine, Inc. to a Spectrum of Misquotation Libel Cases, 48 Wash. & Lee L. Rev. 1441, 1460 (1991) (under doctrine of substantial truth, a defendant "can be liable only if an actionable amount of reputational harm to the plaintiff actually arises from a falsification — otherwise, the plaintiff can have no cause of action for libel"). As previously noted, that determination is made by using the following test: "A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." Tannerite Sports, LLC, 864 F.3d at 242 (quotation and brackets omitted). If the inaccuracy does not have a materially different effect upon the reader than that which the literal truth would produce, then it is substantially true. See Mark, 635 P.2d at 1093; Riley, 529 A.2d at 253; Raudenbush, supra at 1461 (stating that "the core purpose of the substantial truth doctrine is simply to discern whether the defamatory effect of a contested statement arises overwhelmingly from a gleam of truth shining through any falsity, or whether the falsity superimposed upon the truth also contributes an actionable injurious effect"). As the Tenth Circuit Court of Appeals has explained, it is the plaintiff's burden to show that a statement is not only false, but "materially false." Brokers' Choice of America, 861 F.3d at 1107. "To be material, an

alleged falsehood must be likely to cause reasonable people to think significantly less favorably about the plaintiff than they would if they knew the truth." Id. (emphasis added; quotation omitted); see Bustos v. A&E Television Networks, 646 F.3d 762, 765 (10th Cir. 2011); Pope v. Chronicle Pub. Co., 95 F.3d 607, 613 (7th Cir. 1996) (implicit in the defense of substantial truth "is the idea that publication as it stood must make the plaintiff significantly worse off than a completely or literally truthful publication would have" (emphasis added)). "A misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest." Broker's Choice of America, 861 F.3d at 1107 (quotation and brackets omitted); see Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1228 (7th Cir. 1993) (news report containing falsehood is actionable only when significantly greater opprobrium results than would result from report without the falsehood).

The First Amendment requires that the burden of proving falsity, when the plaintiff is a public figure or the statement involves a matter of public concern, lies with the plaintiff. Bustos, 646 F.3d at 764; see Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1986). Here, while disbarment is a more serious punishment than suspension, I note that a disbarred attorney may at a later date apply to be readmitted to the bar, see Sup. Ct. R. 37(14), and that suspensions may be lengthy. The gist or sting of the mailer is the plaintiff's criminal history. Nothing in the mailer alleges or suggests that at any time after his conviction, the plaintiff engaged in the unauthorized practice of law. Rather, as the trial court found:

> The purpose of the flyer in its entirety is to notify potential voters of Plaintiff's previous criminal activity and that, as a result of such criminal activity, his law license was adversely affected. . . . [I]t is not apparent that Plaintiff's reputation would have fared better if Defendants had used the word 'suspended' as opposed to 'disbarred,' as the reader's takeaway remains the same.

I believe that our decision in Thomas is dispositive. There, the plaintiff argued that the trial court erred in ruling that certain inaccurate statements were substantially true. Four of the statements pertained to a conviction or sentence the plaintiff received in connection with criminal activity. We agreed with the trial court, stating: "If the defamatory statement is a specific allegation of the commission of a particular crime, the statement is deemed true for purposes of a substantial truth defense if the plaintiff did commit that crime.'" Id. at 336-37 (quoting Restatement (Second) of Torts § 581A comment c at 236) (brackets omitted).

Similarly, here the inaccurate statement pertains to the legal consequences that the plaintiff received in connection with his criminal activity. The statement is substantially true because the plaintiff in fact did

20

commit the underlying crime.  See id.; see also Panas, 129 N.H. at 611 (annulment statute has no effect upon the facts giving rise to the conviction).

A similar issue was presented in Behr v. Meredith Corp., 414 N.W.2d 339 (Iowa 1987), where the defendant published an article entitled "How Farmers Steal From the Government" that stated that the plaintiff had understated his 1980 soybean crop by 11,000 bushels and had insured his beans for $6.00 per bushel.  Behr, 414 N.W.2d at 340-41.  It then stated that the plaintiff "received more than $100,000 in indemnity claims." Id. at 341.  The Iowa Supreme Court agreed with the plaintiff that this sentence could be construed to mean that he received money, which was not true.  Id. at 342-43.  The report then accurately stated that the plaintiff was sentenced to thirty days in prison, one year probation, 400 hours of community service, and fined $10,000.  Id. at 343.

The court explained that the gist or sting of the paragraph about the plaintiff was that he was adjudged guilty of a crime involving fraud against the federal government, as were other farmers mentioned in the article.  Id. Whether the plaintiff received any money as a result of his conduct was immaterial to the truth of the gist or sting, because receiving money was not the essence of the offense.  Id.  The essence of the offense was the filing of false claims, which was correctly reported.  Id.  Therefore, the court ruled, as a matter of law, that the article was substantially true, and ordered that summary judgment be entered in favor of the defendants.  Id. at 343-44.

Here, the gist or sting of the challenged statement is the plaintiff's criminal conduct.  The defendants accurately stated the underlying crime, but erred in their use of legal terminology regarding one of the consequences of the criminal conduct.  "The man in the street would be likely to characterize the mistake as a 'technicality.'" Id. at 344 (quotation omitted); cf. Boyle v. Dwyer, 172 N.H. 548, 554 (2019) (defamatory meaning must be one that could be ascribed to the words by persons of "common and reasonable understanding").

As noted above, it is the plaintiff's burden to show that a statement is not only false, but "materially false." Brokers' Choice of America, 861 F.3d at 1107.  "To be material, an alleged falsehood must be likely to cause reasonable people to think significantly less favorably about the plaintiff than they would if they knew the truth." Id. (emphasis added; quotation omitted).  Here, the misstatement, which used the wrong label in referring to the degree of one of the consequences of the plaintiff's criminal conduct, was not materially false.

## II. The Invasion of Privacy — False Light Claim

In its order dismissing the plaintiff's false light claim, the trial court stated: "As an initial matter, the Court notes that New Hampshire has never

recognized a cause of action for false light invasion of privacy." The court then proceeded to assume for purposes of the order that such a cause of action, as set forth in the Restatement (Second) of Torts, exists and concluded that the plaintiff failed to state a claim upon which relief can be granted.

On appeal, the plaintiff challenges only one of the two grounds upon which the trial court ruled — he argues that he stated a claim that would satisfy the elements of the tort as set forth in the Restatement. Because the trial court set forth two grounds that independently support its ruling, however, the plaintiff was obliged to challenge both grounds on appeal. Here the plaintiff neither challenges the trial court's ruling that New Hampshire has not recognized a cause of action for false light invasion of privacy, nor argues that this court should now recognize such a cause of action. Accordingly, we should affirm the dismissal of his claim. See Koor Communication v. City of Lebanon, 148 N.H. 618, 624 (2002) (where trial court order set forth two grounds supporting grant of summary judgment but appellant's brief challenged only one of them, court upheld grant of summary judgment on the basis of the unchallenged ground without addressing merits of appellant's arguments as to other ground).

As explained above, I also disagree with the majority's conclusion that as a matter of New Hampshire law, "conveying the plaintiff's conviction without including the fact of the conviction's annulment is a falsehood." Thus, I would affirm the trial court's dismissal of this claim.

### III. Conclusion

Bushels and beans aside, in my mind the majority opinion is inconsistent with the plain language of RSA 651:5 and with fundamental First Amendment principles. I would affirm the decision below in its entirety.

22